IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

OMAR RODRIGUEZ FUENTES          :          CIVIL ACTION
                                      :
          v.                        :
                                      :
SCHOOL DISTRICT OF THE CITY       :
OF PHILADELPHIA, et al.            :          NO. 17-3736

**MEMORANDUM ORDER**

THOMAS J. RUETER                                      April 4, 2019
United States Magistrate Judge

Plaintiff, Omar Rodriguez Fuentes, brings this action against the School District of the City of Philadelphia ("SDP" or "School District"), Chief Inspector Carl W. Holmes, Jr. ("Holmes"), and Ryan Smith, a Philadelphia School District Police Officer ("SPO Smith"), pursuant to 42 U.S.C. §§ 1983 and 1988, alleging, inter alia, that plaintiff's constitutional rights were violated during a physical altercation between SPO Smith and plaintiff, in which SPO Smith punched plaintiff, knocked him to the ground, and kicked and stomped on him while he was on the ground. See Doc. 8 ("Am. Compl.").

Presently before the court are the motions for summary judgment filed by defendant SDP (Doc. 34) ("SDP Mot.") and defendant Holmes (Doc. 35) ("Holmes Mot.").[1] For the reasons stated herein, the motions for summary judgment are **GRANTED**.

---

[1]      The parties filed numerous documents in support of, and in response to, the motions for summary judgment. Attached as Exhibit A to the SDP Motion is defendant SDP's Statement of Undisputed Facts (SDP Mot., Ex. A) ("SDP's Stmt. of Facts").
         Plaintiff filed an omnibus opposition to the motions for summary judgment (Doc. 42) ("Pl.'s Resp."), which included Plaintiff's Additional Statement of Material Facts that Preclude the Granting of Summary Judgment. See Pl.'s Resp., Ex. A ("Pl.'s Add'l Stmt. of Facts"). Plaintiff also filed a Response to Defendant School District of Philadelphia's Statement of Undisputed Facts (Doc. 43) ("Pl.'s Resp. to SDP's Stmt. of Facts") and Exhibits in Support of Plaintiff's Opposition to Defendants' Motions for Summary Judgment (Doc. 44).

## I.    FACTUAL BACKGROUND

At all times relevant to plaintiff's claim, plaintiff was a seventeen-year-old student who attended Kensington Business High School, a school within the School District of Philadelphia.  (SDP's Stmt. of Facts at ¶ 1; Pl.'s Resp. to SDP's Stmt. of Facts at ¶ 1.)  On the afternoon of April 16, 2015, plaintiff left his school early and met his girlfriend, Angie Martinez.  (SDP's Stmt. of Facts at ¶ 5; Pl.'s Resp. to SDP's Stmt. of Facts at ¶ 5.)  The two walked to nearby Kensington Health Sciences Academy, also a School District of Philadelphia school, to meet Angie's sister, Lisa.  Id.  Plaintiff and Angie arrived before dismissal and waited on the sidewalk.  (SDP's Stmt. of Facts at ¶ 6; Pl.'s Resp. to SDP's Stmt. of Facts at ¶ 6.)  At some point, SPO Smith approached plaintiff and Angie and told them to wait on the other side of the sidewalk.  (SDP's Stmt. of Facts at ¶ 7; Pl.'s Resp. to SDP's Stmt. of Facts at ¶ 7.)  While plaintiff and Angie were waiting, Angie became involved in an argument with another female.  The argument escalated and led to a physical altercation between Angie and the female.  (SDP's Stmt. of Facts at ¶¶ 9-10; Pl.'s Resp. to SDP's Stmt. of Facts at ¶¶ 9-10; Pl.'s Add'l Stmt. of Facts at ¶ 2.)  SPO Smith ran over and attempted to separate the girls.  (SDP's Stmt. of Facts at ¶ 11; Pl.'s Add'l Stmt. of Facts at ¶ 3.)  A physical altercation then occurred between plaintiff and SPO Smith, the details of which are in dispute.  (SDP's Stmt. of Facts at ¶ 12; Pl.'s Add'l Stmt. of Facts at ¶¶ 4-8.)  A video of the incident, or a portion of the incident, was recorded.  SPO Smith has acknowledged that he is the school police officer in the video and that the video does

---

Defendant SDP also filed a Response to Plaintiff's Additional Statement of Material Facts (Doc. 45) and a reply brief in support of its motion for summary judgment (Doc. 46) ("SDP Reply").  In addition, SPO Smith filed a Response to Plaintiff's Additional Statement of Material Facts (Doc. 47) and defendant Holmes filed a Response to Plaintiff's Additional Statement of Material Facts (Doc. 48).  The court has considered all pleadings and documents submitted by the parties, including the exhibits appended to the parties' submissions.

not appear doctored or altered.  (Pl.'s Add'l Stmt. of Facts at ¶¶ 9-10; Doc. 45 at ¶¶ 9-10; Doc. 47.)

SPO Smith filed an incident report with the School District through Kensington Health Sciences Academy in which he indicated that while he was breaking up a fight, plaintiff jumped on his back and punched him in the head.  (Doc. 44, Ex. G.)  Subsequently, there was a Philadelphia Police investigation of an assault of a teacher in a public school.  (Doc. 44, Ex. J; Doc. 45 at ¶ 16; Doc. 47.)  SPO Smith has since acknowledged that plaintiff did not strike him in the head, but maintained that someone did.  (Pl.'s Add'l Stmt. of Facts at ¶ 15; Doc. 45 at ¶ 15; Doc. 47.)  See also Doc. 44, Ex. B (hereinafter "Smith Dep.") at 63:10-64:16.  SPO Smith viewed the video the day after the incident and did not amend any reports that he made to the Philadelphia Police or to the School District through Kensington Health Sciences Academy. (Pl.'s Add'l Stmt. of Facts at ¶ 17; Doc. 45 at ¶ 17; Doc. 47.)  Plaintiff was not arrested in relation to this incident.  (SDP's Stmt. of Facts at ¶ 14; Pl.'s Resp. to SDP's Stmt. of Facts at ¶ 14.)

Defendant SDP maintains a formal process for the screening and evaluating of applicants to become school police officers.  Plaintiff disputes the adequacy of such procedures. (SDP's Stmt. of Facts at ¶¶ 16-17; Pl.'s Resp. to SDP's Stmt. of Facts at ¶¶ 16-17.)  SPO Smith was arrested in 1998 at age eighteen for obstructing a highway passage.  See Smith Dep. at 12:17-14:15.  He pled guilty to a summary offense, took a class, paid his fine, and the incident was expunged from his record.  He has not been arrested since that date and has no criminal record.

SPOs undergo an initial multi-week training program.  (SDP's Stmt. of Facts at ¶ 22.)  SPOs undergo additional annual trainings at the beginning of each school year.  Id. at ¶ 29.

SPOs are periodically retrained on conflict de-escalation and the use of force. (SDP's Stmt. of Facts at ¶ 30.)[2] The School District maintains written policies for SPOs known as Directives; these Directives cover a number of topics including the use of force. (SDP's Stmt. of Facts at ¶ 24; Pl.'s Resp. to SDP's Stmt. of Facts at ¶ 24.) See also SDP Mot., Ex. H (hereinafter "Use of Force Directive"). The Use of Force Directive dated 8/11/2016 is substantively the same as the one in effect in 2014. (SDP's Stmt. of Facts at ¶ 28; Pl.'s Resp. to SDP's Stmt. of Facts at ¶ 28.)

The School District maintains a policy for investigating allegations of inappropriate conduct by SPOs. (SDP's Stmt. of Facts at ¶ 32.) See also SDP Mot., Ex. F (hereinafter "Lee Dep.") at 42:24-45:3, 65:20-68:10. If it is determined that inappropriate conduct occurred during the course of an investigation, an SPO is recommended for discipline. The final determination of what discipline is appropriate is handled by an independent hearing officer after a fact-finding hearing on the issue. (SDP's Stmt. of Facts at ¶ 33; Pl.'s Resp. to SDP's Stmt. of Facts at ¶ 33.) There is no evidence that any complaints of any kind were filed against SPO Smith from the date of his initial employment until this incident. (SDP's Stmt. of Facts at ¶ 31; Pl.'s Resp. to SDP's Stmt. of Facts at ¶ 31.) The parties dispute the number of allegations of excessive force investigated by the School District in the past five years. That is, in a supplemental response to plaintiff's first set of interrogatories, defendant SDP listed eleven allegations of excessive force in the prior five-year period. See SDP's Mot., Ex. I. However, plaintiff has presented evidence of two additional investigations of excessive force which were not included in defendant SDP's list of investigations. See Doc. 44 at Exs. V and W.

---

[2]    However, plaintiff avers that SPOs are allowed to miss classes offered during the initial multi-week training program, are allowed to miss annual training sessions, and are not disciplined for missing classes. (Pl.'s Resp. to SDP's Stmt. of Facts at ¶¶ 22-29.) Furthermore, plaintiff avers that SPO Smith was not periodically retrained in conflict de-escalation or the use of force. Id. at ¶ 30.

Plaintiff's Amended Complaint presents seven counts: (1) Count I - use of excess force in violation of the Fourth and Fourteenth Amendments, pled against SPO Smith; (2) Count II - use of excess force in violation of the Fourth and Fourteenth Amendments, pled against defendants SDP and Holmes; (3) Count III - due process violations under the Fourteenth Amendment, pled against SPO Smith; (4) Count IV - due process violations under the Fourteenth Amendment, pled against defendants SDP and Holmes; and (5) Count V - failure to adequately screen, train, and supervise or discipline, pled against defendants SDP and Holmes. See Am. Compl. Defendants SDP and Holmes each assert that summary judgment should be entered in their favor on all claims brought against them.

## II.    STANDARD OF REVIEW

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is material when "it might affect the outcome of the suit under governing law," and genuine when "the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The moving party has the initial burden of informing the court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 325 (1986). There is no genuine issue as to any material fact if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322-23.

To defeat summary judgment, however, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita

Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "The non-moving party must oppose the motion and, in doing so, may not rest upon the mere allegations or denials of his pleadings. His response . . . must set forth specific facts showing that there is a genuine issue for trial. Bare assertions, conclusory allegations, or suspicions will not suffice." D.E. v. Cent. Dauphin Sch. Dist., 765 F.3d 260, 268-69 (3d Cir. 2014) (internal citations and quotations omitted). A mere "scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson, 477 U.S. at 252.

In considering a motion for summary judgment, the evidence must be considered in the light most favorable to the non-moving party, and all inferences must be drawn in that party's favor. Celotex Corp., 477 U.S. at 322. However, if "the evidence [offered by the non-moving party] is merely colorable or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50.

## III.    DISCUSSION

Plaintiff's claims against defendants SDP and Holmes are based on alleged violations under 42 U.S.C. § 1983. Section 1983 provides that persons acting under color of state law may be found liable if they deprive an individual of "any rights, privileges, or immunities secured by the Constitution and laws" of the United States. See 42 U.S.C. § 1983; West v. Atkins, 487 U.S. 42, 48 (1988). Section 1983 does not confer substantive rights, but rather "provides a method for vindicating federal rights elsewhere conferred." Hildebrand v. Allegheny Cnty., 757 F.3d 99, 104 (3d Cir. 2014) (citing Albright v. Oliver, 510 U.S. 266, 271 (1994)) (internal quotation marks and citations omitted), cert. denied, 135 S. Ct. 1398 (2015). "The first step in evaluating a section 1983 claim is to identify the exact contours of the underlying right said to have been violated and to determine whether the plaintiff has alleged a

deprivation of a constitutional right at all." Chavarriaga v. New Jersey Dep't of Corr., 806 F.3d 210, 222 (3d Cir. 2015) (internal citations and quotations omitted). A plaintiff must then demonstrate a defendant's personal involvement in the alleged wrongs but cannot predicate defendants' liability on a respondeat superior theory. Id. at 222-23 (citing Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988) and Parratt v. Taylor, 451 U.S. 527, 537 n.3 (1981)).

With respect to the claims raised against defendant SDP, the term "person" includes municipalities. Monell v. Dep't of Soc. Servs. of New York, 436 U.S. 658, 690 (1978). See also Chambers ex rel. Chambers v. Sch. Dist. of Phila. Bd. of Educ., 587 F.3d 176, 194 (3d Cir. 2009) (using Monell standard to evaluate claims against the School District of Philadelphia). Because a municipality may not be held liable under a theory of respondeat superior, there must be an "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." Monell, 436 U.S. at 691, 694.

A.      **Count II – Use of Excessive Force**

In Counts I and II of the Amended Complaint, plaintiff presents claims based on an alleged use of excessive force by SPO Smith during the incident on April 16, 2015. The Supreme Court has held that all claims alleging the use of excessive force in the context of an arrest, investigatory stop, or seizure must be "analyzed under the Fourth Amendment and its 'reasonableness' standard." Graham v. Connor, 490 U.S. 386, 395 (1989); see Rivas v. City of Passaic, 365 F.3d 181, 198 (3d Cir. 2004). To prevail on a Fourth Amendment excessive force claim, "a plaintiff must show that a seizure occurred and that it was unreasonable under the circumstances." Lamont v. New Jersey, 637 F.3d 177, 182-83 (3d Cir. 2011). "A 'seizure' triggering the Fourth Amendment's protections occurs only when the government actors have,

'by means of physical force or show of authority . . . in some way restrained the liberty of a

citizen.'" <u>Graham</u>, 490 U.S. at 395 n.10 (quoting <u>Terry v. Ohio</u>, 392 U.S. 1, 19 n.16 (1968)).[3]

---

[3]     In the parties' summary judgment submissions, the parties dispute which standard should be applied to plaintiff's excessive force claim. In deciding whether the challenged conduct constitutes excessive force, plaintiff's claim is appropriately analyzed under the Fourth Amendment's objective reasonableness standard, rather than the Fourteenth Amendment's "shocks the conscience" standard articulated in <u>Gottlieb v. Laurel Highlands Sch. Dist.</u>, 272 F.3d 168 (3d Cir. 2001). <u>See</u> <u>Graham</u>, 490 U.S. 386 (articulating objective reasonableness standard); <u>see also</u> <u>Zorbah v. Sch. Dist. of Phila.</u>, 2014 WL 535242, at *3-4 (E.D. Pa. Feb. 10, 2014) (applying reasonableness standard). In <u>Gottlieb</u>, the Third Circuit applied the Fourteenth Amendment's "shocks the conscience standard to federal claims alleging the use of excessive force by public school officials." 272 F.3d at 172. In reaching its conclusion, the court considered the excessive force claim of a disruptive student who was pushed into a doorjamb by a principal of the school. The court first considered whether the claim should be analyzed under the reasonableness standard of the Fourth Amendment or the shocks the conscience standard of the Fourteenth Amendment. <u>Id.</u> at 171. The court stated:

> The Fourth Amendment's prohibition against unreasonable seizures, . . . , does not properly cover Gottlieb's alleged injury. Courts have recognized that public schools are in a "unique constitutional position," because "[o]nce under the control of the school, students' movement and location are subject to the ordering and direction of teachers and administrators." <u>Wallace by Wallace v. Batavia Sch. Dist. 101</u>, 68 F.3d 1010, 1013 (7th Cir. 1995); <u>see also</u> <u>Vernonia Sch. Dist. 47J v. Acton</u>, 515 U.S. 646, 655, 115 S.Ct. 2386, 2392, 132 L.Ed.2d 564 (1995) (students are lawfully subject to a level of restraint that would be unacceptable if "exercised over free adults."). The Fourth Amendment's "principal concern . . . is with intrusions on privacy," and therefore when the infraction deals not "with the initial decision to detain an accused and the curtailment of liberty that such a decision necessarily entails, but rather with the conditions of ongoing custody following such curtailment of liberty," then the claim invokes principles of substantive due process. <u>Ingraham</u>, 430 U.S. at 674, 97 S. Ct. at 1401 (citation omitted).

<u>Id.</u> at 171-72. The court reasoned that the plaintiff did not experience the type of detention or physical restraint that we require to effectuate a seizure because the momentary use of physical force by a teacher in reaction to a disruptive or unruly student does not effect a seizure of the student under the Fourth Amendment. <u>Id.</u> (internal quotations omitted).

    A concept central to the <u>Gottlieb</u> court's analysis, that the plaintiff was under the control of the school at the time of the incident, is inapposite to the case at bar. That is, the facts of the present case differ greatly from those of <u>Gottlieb</u>. At the time of the April 16, 2015 incident, plaintiff was a student at Kensington Business High School and defendant Smith was an SPO assigned to another SDP school, Kensington Health Sciences Academy. <u>See</u> SDP Mot., Ex. A, ¶¶ 1, 3; Smith Dep. at 17:17-20, 54:1-4; Doc. 44, Ex. A (hereinafter "Pl. Dep.") at 68:3-18. The schools are located approximately one block away from each other and the incident took place at dismissal on the sidewalk across the street from Kensington Health Sciences Academy. <u>See</u> Pl. Dep. at 61:16-19. Thus, the incident transpired after plaintiff left his school for the day and did not even occur at the school at which plaintiff was a student. In contrast to the plaintiff in <u>Gottlieb</u>, the plaintiff in the present case was not under the control of his school at the time of the

With respect to the claim presented in Count II, plaintiff alleges that defendant SDP's and defendant Holmes' "encouragement, toleration, ratification, and/or deliberate indifference to prior violations committed by School District Police Officers and their subsequent failure to sanction, discipline, and otherwise address violations of their polices is a direct and proximate cause of Officer Smith's use of excessive force upon Plaintiff."  (Am. Compl. at ¶ 47.)  Plaintiff's Count II claim, presented against defendants SDP and Holmes, fails for several reasons.

### 1.    Defendant SDP

The Third Circuit has explained <u>Monell</u> liability as follows:

> Based on the Supreme Court's reasoning in the landmark <u>Monell</u> case, courts have recognized a "two-path track to municipal liability under § 1983, depending on whether the allegation is based on municipal policy or custom."  [<u>Beck v. City of Pittsburgh</u>, 89 F.3d 966, 971 (3d Cir. 1996)].

>> Policy is made when a "decisionmaker possess[ing] final authority to establish municipal policy with respect to the action" issues an official proclamation, policy, or edict.  A course of conduct is considered to be a "custom" when, though not authorized by law, "such practices of state officials [are] so permanent and well-settled" as to virtually constitute law.

> [<u>Andrews v. City of Phila.</u>, 895 F.2d 1469, 1480 (3d Cir. 1990)] (citations omitted) (alterations in original).  "Custom . . . may also be established by evidence of knowledge and acquiescence."  <u>Beck</u>, 89 F.3d at 971.

> An official has policymaking authority for <u>Monell</u> purposes when the official is responsible as a matter of state law for making policy in the particular area of county business in question, and the official's authority to make policy in that area is final and unreviewable.  <u>Hill v. Borough of Kutztown</u>, 455 F.3d 225, 245-46 (3d Cir. 2006).

---

incident.  As a result, plaintiff here experienced the type of detention or physical restraint is required to effectuate a seizure.  <u>See, e.g.</u>, <u>Salyer v. Hollidaysburg Area Sch. Dist.</u>, 2018 WL 3579838, at *11 (W.D. Pa. July 25, 2018) ("[S]eizures in the public school context [are] governed by the reasonableness standard.") (quoting <u>Shuman ex rel. Shertzer v. Penn Manor Sch. Dist.</u>, 422 F.3d 141, 148 (3d Cir. 2005)).  <u>See also</u> <u>Geist v. Ammary</u>, 40 F. Supp. 3d 467, 475-76 (E.D. Pa. 2017)  (using reasonableness standard to analyze student's Fourth Amendment excessive force claim against police officer employed by the Allentown Police Department who was assigned as a School Resource Officer).

Mulholland v. Gov't Cty. of Berks, Pa., 706 F.3d 227, 237-38 (3d Cir. 2013). "[A] policy or custom may also exist where 'the policymaker has failed to act affirmatively at all, though the need to take some action to control the agents of the government is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need." Natale v. Camden Cty. Corr. Facility, 318 F.3d 575, 584 (3d Cir. 2003) (internal quotations omitted) (citing Bd. of Cty. Comm'rs of Bryan Cty., Oklahoma v. Brown, 520 U.S. 397, 417-18 (1997) (hereinafter "Bryan County")). "Once a § 1983 plaintiff identifies a municipal policy or custom, he must 'demonstrate that, through its deliberate conduct, the municipality was the moving force behind the injury alleged.'" Berg v. Cty. of Allegheny, 219 F.3d 261, 276 (3d Cir. 2000) (quoting Bryan County, 520 U.S. at 404). "If the policy or custom does not facially violate federal law, causation can be established only by demonstrating that the municipal action was taken with deliberate indifference as to its known or obvious consequences. A showing of simple or even heightened negligence will not suffice." Id. (internal citations, quotations and alterations omitted).

The court construes plaintiff's Count II claim against defendant SDP as alleging that defendant SDP had a custom of tolerating or otherwise failing to address prior claims of excessive force against SPOs, and this custom led SPO Smith to believe that his conduct with regard to plaintiff was acceptable. See Am. Compl. at ¶¶ 44-50. However, the evidence does not support this claim.

First, it cannot be said that defendant SDP has a "custom" of tolerating the use of excessive force that is so "well-settled" as to virtually constitute law. That is, the SDP takes affirmative steps to educate SPOs on the use of excessive force and investigate claims of the use

of excessive force by SPOs. The evidence shows that defendant SDP has an excessive force policy, its officers receive initial training in the policy upon commencement of employment, and receive additional training in the use of force, inter alia. See Doc. 44, Ex. D (hereinafter "Farr Dep.") at 41:7-42:2, 75:24-76:10, 77:4-79:3. In addition, defendant SDP investigates claims of the use of excessive force and other claims of impropriety against SPOs. See Lee Dep. at 42:24-45:3, 65:20-68:10. If it is determined that inappropriate conduct occurred during the course of an investigation, an SPO is recommended for discipline. The final determination of what discipline is appropriate is handled by an independent hearing officer after fact-finding hearing on the issue. See id.

Additionally, plaintiff has not demonstrated that a municipal action was taken with deliberate indifference to its known or obvious consequences. "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." Thomas v. Cumberland Cty., 749 F.3d 217, 223 (3d Cir. 2014) (citing Bryan County, 520 U.S. at 410). "Ordinarily, '[a] pattern of similar constitutional violations is necessary to demonstrate deliberate indifference.'" Id. (quoting Connick v. Thompson, 563 U.S. 51, 62 (2011)). See also Carswell v. Borough of Homestead, 381 F.3d 235, 244 (3d Cir. 2004) ("Demonstrating deliberate indifference 'typically requires proof of a pattern of underlying constitutional violations.'"). Here, plaintiff has not made such a showing. In support of its motion, defendant SDP listed eleven allegations of excessive force in the prior five-year period. See SDP Mot., Ex. I. Of the eleven allegations of excessive force listed by defendant SDP, two were determined to be unsubstantiated, five were determined to be unfounded, three resulted in a warning, and one resulted in the termination of employment. See id. Plaintiff has presented evidence of two additional investigations of excessive force which

were not included in defendant SDP's list of investigations.  In one instance, after investigation, it was determined that the SPO responded appropriately and the student was arrested and charged with aggravated simple assault and simple assault.  See Doc. 44, Ex. V.  With respect to the other incident raised by plaintiff, after investigation, it was determined that the SPO used the amount of force reasonably necessary.  See Doc. 44, Ex. W.  Thus, of the investigations cited by both defendant SDP and plaintiff, while three SPOs were warned, only one allegation resulted in a finding that the SPO used excessive force.  Moreover, the evidence merely demonstrates that defendant SDP has received allegations of excessive force and that it investigated such complaints.  It does not show repeated constitutional violations.  See Brown v. New Hanover Twp. Police Dep't, 2008 WL 4306760, at *15 (E.D. Pa. Sept. 19, 2008) (granting summary judgment on Monell "custom" claim because "[r]ather than simply reciting a number of complaints or offenses, a Plaintiff must show why those prior incidents deserved discipline and how the misconduct in those situations was similar to the present one").

Additionally, plaintiff cannot point to a similar pattern of conduct by SPO Smith. See Beck v. City of Pittsburgh, 89 F.3d 966, 9784 (3d Cir. 1996) (finding that five excessive force complaints in five years against one officer were in a narrow period of time and of similar nature, such that a reasonable jury could have inferred that the Chief of Police knew, or should have known, of the officer's propensity for violence when making arrests.).  Although a claim of excessive force was raised against SPO Smith one month after the April 16, 2015 incident, prior to the April 16, 2015 incident, SPO Smith had no claims raised against him.  See Smith Dep. at 96:18-112:1; Doc. 44, Ex. L.

Moreover, defendant SDP cannot be liable under § 1983 unless the purported custom is the "moving force" behind the constitutional violation.  See City of Canton, 489 U.S.

at 390.  Plaintiff has not presented evidence that demonstrates a link between the purported custom of tolerance of the use of excessive force by defendant SDP and the action taken by SPO Smith.  When asked whether he was aware, before April 16, 2015, of any other SPOs being disciplined for the use of excessive force, or for any other behaviors, SPO Smith indicated that he was not aware of any such discipline, indicating, "I wouldn't be in a position to know that." See Smith Dep. at 112:10-22.  He also confirmed that he had not heard any rumors or talk to that effect.  Id. at 112:23-25.  In addition, SPO Smith acknowledged that he had never witnessed any SPOs using excessive force.  Id. at 112:14-16.  When asked whether he was aware of any SPOs being fired for any type of disciplinary reasons, he replied, "[n]o, I wouldn't be knowledgeable about that" and "I'm not privy to that information."  Id. at 113:1-5.  This evidence demonstrates that SPO Smith was not aware of the purported custom of tolerance of the use of excessive force by other SPOs, as he testified that he was not aware of other instances of the use of excessive force and that he "would not be in a position to know" if other SPOs were disciplined.  Thus, evidence does not support plaintiff's claim that the School District had a custom of tolerating the use of excessive force which was the moving force behind SPO Smith's actions on April 16, 2015.

In the absence of such evidence, plaintiff relies on conjecture in support of his Count II claim.  No reasonable jury could find based on the evidence before the court that there was a deliberately indifferent custom of tolerating the use of excessive force by SPOs that caused SPO Smith to use excessive force upon plaintiff on April 16, 2015.  Thus, summary judgment is appropriate on plaintiff's Count II claim against defendant SDP.

### 2. Defendant Holmes

Defendant Holmes contends that he is entitled to summary judgment on all claims raised against him because he lacks personal involvement in the alleged wrongs, and there are no factual allegations against him establishing his personal involvement. (Holmes Mot. at 6-8.) As defendant Holmes points out, plaintiff's claims against him are rooted in a supervisory liability theory. See id. at 4. In considering a motion to dismiss, the Honorable Mitchell S. Goldberg recently provided a succinct explanation of this theory of liability:

> The mere fact, without more, that a defendant holds a supervisory position is insufficient to prove a cause of action because § 1983 does not support civil rights claims based upon a theory of respondeat superior. Durmer v. O'Carroll, 991 F.2d 64, 69 n.14 (3d Cir. 1993). Rather, § 1983 liability against a state official in his individual capacity must be premised on one of two theories. First, an individual supervisor may be liable on grounds of personal involvement. See Evancho v. Fisher, 423 F.3d 347, 353 (3d Cir. 2005) (citing Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988) ("A defendant in a civil rights action must have personal involvement in the alleged wrongs.")). "Personal involvement can be shown through allegations of personal direction or of actual knowledge or acquiescence. Rode, 845 F.2d at 1207; see also C.H. ex rel. Z.H. v. Oliva, 226 F.3d 198, 201 (3d Cir. 2000) ("It is, of course, well established that a defendant in a civil rights case cannot be held responsible for a constitutional violation which he or she neither participated in nor approved."). Such allegations "must be made with appropriate particularity," meaning that a plain allegation that a defendant had responsibility for supervising other defendants is insufficient. Rode, 845 F.2d at 1207.
>
> Alternatively, "individual defendants who are policymakers may be liable under § 1983 if it is shown that such defendants, 'with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm.'" A.M. ex rel. J.M.K. v. Luzerne Cty. Juvenile Detention Ctr., 372 F.3d 572, 586 (3d Cir. 2004) (quoting Stoneking v. Bradford Area Sch. Dist., 882 F.2d 720, 725 (3d Cir. 1989)). "A policymaker is an official with 'final, unreviewable discretion to make a decision or take an action.'" Gelpi v. City of Phila., 183 F. Supp. 3d 684, 689 (E.D. Pa. 2016) (quoting Andrews v. City of Phila., 895 F.2d 1469, 1481 (3d Cir. 1990)).

Jones v. Williams, 2019 WL 934955, at *2 (E.D. Pa. Feb. 25, 2019).

Plaintiff has not established a claim against defendant Holmes under the first theory of supervisory liability with respect to Count II. Defendant Holmes would be liable to plaintiff pursuant to this theory if "he participated in violating the plaintiff's rights, directed others to violate them, or as the person in charge, had knowledge and acquiesced in his subordinates' violations." See Santiago v. Warminster Twp., 629 F. 3d 121, 129 (3d Cir. 2010). In Parkell v. Danberg, the Third Circuit noted that if the defendant knew about the alleged unreasonable search practices and had the authority to change them, but chose not to, "that might constitute supervisory involvement in violating" the plaintiff's rights. 833 F.3d 313, 331 (3d Cir. 2016) (citing Santiago, 629 F.3d at 129 n.5). The court further noted that "we do not believe that an official is 'enforcing,' 'maintaining,' or 'acquiescing in' a policy merely because the official passively permits his subordinates to implement a policy that was set by someone else and is beyond the official's authority to change." Id.

Plaintiff has not offered any evidence that demonstrates that defendant Holmes participated in the alleged use of excessive force on plaintiff, directed others to use excessive force on plaintiff, or had knowledge and acquiesced in his subordinates' use of excessive force on plaintiff. Indeed, defendant Holmes did not directly supervise SPO Smith, SPO Smith never directly reported to defendant Holmes, and defendant Holmes was not present on the date of the April 2015 incident. See Smith Dep. at 19:17-30; 82:13-83:15; 119:4-11, 23-25. Compare Brackbill v. Ruff, 2018 WL 2322014, at *7 (M.D. Pa. May 22, 2018) (finding plaintiff sufficiently pled a claim of supervisory liability where plaintiff alleged that the defendant was a field supervisor, was present at the scene of the incident, was informed of the situation and spoke directly with the plaintiff regarding his version of the events, participated in the decision to arrest, and knowingly permitted his subordinate to make the allegedly unlawful arrest, thereby

ratifying the unlawful conduct), with Hicks v. Camden Cty., 2017 WL 68620, at *3 (D.N.J. Jan.

6, 2017) (dismissing claim that alleged supervisory liability on the basis that the allegation that

"they failed to adequately track excessive force complaints does not establish personal

involvement or actual knowledge of an acquiescence [in the alleged excessive force]").

   With respect to the second theory of supervisory liability, plaintiff's Count II

claim against defendant Holmes also fails. "To establish a claim against a policymaker under §

1983 a plaintiff must allege and prove that the official established or enforced policies and

practices directly causing the constitutional violation." Parkell, 833 F.3d at 331 (internal

quotations and citations omitted). See also Chavarriaga, 806 F.3d at 223 (same). In Parkell, the

plaintiff alleged that the prison's policy of thrice-daily visual body-cavity searches while he was

in isolation violated his Fourth Amendment rights. 833 F.3d at 323. With respect to the

plaintiff's Fourth Amendment claim against the Delaware Department of Corrections

Commissioner, the court found the claim to be reliant on improper respondeat superior liability.

Id. at 331. The court reasoned that the plaintiff did not point to any evidence showing where the

search policy, practice, or custom came from, and the Commissioner did not acknowledge any

involvement in establishing or enforcing any specific policies, or even an awareness that the

searches were occurring. Id.[4]

---

[4] Similarly, in Chavarriaga, the Third Circuit upheld the district court's order granting
summary judgment on the plaintiff's claims regarding policymaking liability against former New
Jersey Attorney General Jeffery S. Chiesa and New Jersey Commissioner of Corrections Gary
M. Lanigan. 806 F.3d at 217-18. The court reasoned that the plaintiff's primary allegations
were that the prison personnel deprived her of potable water at the New Jersey state prison for
several days on two separate occasions, subjected her to an impermissible manual body cavity
search, denied her clothing on two separate occasions, and denied her supplies and medications
during her confinement. Id. at 223. But the court noted, however, that the appellant did not
allege in her Complaint that the persons directly involved in this treatment or the other treatment
of which she complained were implementing policies that defendants Chiesa or Lanigan had
promulgated or were following existing practices that they countenanced likely to result in the
violation of inmates' constitutional rights. Id. Thus, she did not allege that defendants Chiesa or

Here, defendant Holmes testified that his "duties were to oversee operations for the Philadelphia School District's Police Department" which entailed "supervising several subordinate commanders" and "[o]verseeing the daily operations of those commanders, ensuring the mission, so to speak, of the school police was carried out." See Doc. 44, Ex. E (hereinafter "Holmes Dep.") at 27:20-21, 28:4-9. However, defendant Holmes also testified that he did not have "final say over the implementation of policy," had no direct authority over disciplining SPOs, had no direct authority to hire or fire SPOs, and that while he made recommendations to the executive director of school safety and the director of school police operations, there were no negative consequences to his subordinates if those recommendations were not followed. See Holmes Dep. at 131:16-132:20. Even if defendant Holmes could be deemed a policymaker, however, plaintiff has proffered no evidence that defendant Holmes established or maintained a policy which directly caused the use of excessive force on plaintiff.[5]

---

Lanigan established policies to deny potable water to inmates, to subject inmates to excessively intrusive body cavity searches, or to subject inmates to the other treatment of which she complains. Id. The court held, therefore, that neither Chiesa nor Lanigan could be held responsible on a policymaker theory of liability for the alleged violations of the appellant's constitutional rights with respect to the denial of water, the body cavity search, or other treatment of which she complained. Id.

[5] Moreover, the court reiterates that plaintiff must establish that the policymaker "with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm." See A.M. ex rel. J.M.K., 372 F.3d at 586. Plaintiff simply has presented no evidence to demonstrate that defendant Holmes acted with deliberate indifference in establishing or maintaining such a policy, practice or custom. In Summers v. Comm'r Charles Ramsey, the plaintiff argued that within the Philadelphia Police Department, there is a widespread custom or practice of using excessive force when making arrests. 2016 WL 7188616, at *9-10 (E.D. Pa. Dec. 12, 2016), aff'd, 705 F. App'x 92 (3d Cir 2017). In granting defendant's motion for summary judgment, the court noted that the plaintiff had failed to produce any evidence that Commissioner Ramsey was aware of the alleged widespread practice or custom. Id. at *9. The court also noted that the plaintiff failed to set forth facts that show that Commissioner Ramsey was deliberately indifferent to the constitutional rights of citizens. Id.

To the extent that plaintiff attempts to establish supervisory liability by showing that defendant Holmes maintained a custom of tolerating past or ongoing constitutional violations, plaintiff's claim fails for the reasons articulated <u>supra</u> with respect to the <u>Monell</u> claim presented against defendant SDP. The evidence does not demonstrate that defendant Holmes maintained a deliberately indifferent custom of tolerating the use of excessive force by SPOs that caused SPO Smith to use excessive force upon plaintiff on April 16, 2015. Rather, plaintiff's assertions with regard to liability by defendant Holmes on a policymaker theory of liability are merely conclusory. <u>See, e.g.</u>, <u>Korth v. Hoover</u>, 190 F. Supp. 3d 394, 404-06 (M.D. Pa. 2016) (dismissing claim because plaintiff's allegations of supervisory liability were conclusory); <u>see also</u> <u>Jerri v. Harran</u>, 2013 WL 4401435, at *1-4 (E.D. Pa. Aug. 16, 2013) (finding plaintiffs' allegations of "knowledge and acquiescence" were "very general and fail[ed] to show any specific knowledge or conduct" such that plaintiffs' allegations were insufficient to establish supervisory liability).

Thus, summary judgment is appropriate on plaintiff's Count II claim against defendant Holmes.[6]

---

[6]     To the extent plaintiff's allegations against defendants SDP and Holmes in Count II can be construed as a failure to supervise or discipline, such claim will be considered <u>infra</u> with respect to Count V of plaintiff's Amended Complaint. "Failure to" claims, failure to train, failure to discipline, or, failure to supervise are generally considered a subcategory of policy or practice liability. <u>Barkes v. First Corr. Med., Inc.</u>, 766 F.3d 307, 316 (3d Cir. 2014), <u>cert. granted</u>, <u>judgment rev'd on other grounds sub nom.</u> <u>Taylor v. Barkes</u>, 135 S. Ct. 2042 (2015).

Furthermore, plaintiff has failed to state a plausible excessive force claim under the Fourteenth Amendment as a due process violation. When alleged wrongful conduct is governed by a specific amendment, as is the case for plaintiff's excessive force claim, a Fourteenth Amendment due process analysis is inappropriate. <u>Berg</u>, 219 F.3d at 268. <u>See also</u> <u>Craddock v. Borough</u>, 2015 WL 1854685, at *6 (E.D. Pa. Apr. 22, 2015) (excessive force claim to be analyzed under Fourteenth Amendment's substantive due process clause which protects against arbitrary government action rather than Fourth Amendment because the alleged constitutional violation did not cause the plaintiff to be seized). Thus, plaintiff's excessive force claim under the Fourteenth Amendment as a stand-alone claim will be dismissed with prejudice.

**B.      Count IV - Procedural Due Process**

In Count III of the Amended Complaint, plaintiff contends that "Officer Smith gave false statements to Philadelphia Police about Plaintiff in which he alleges that he was breaking up a fight when Plaintiff approached him from behind, grabbed him, and punched him in the head.  Officer Smith's statement was placed in a Police Complaint or Incident Report filed against Plaintiff."  (Am. Compl. at ¶ 52.)  Plaintiff claims that he was deprived of his right to due process of law through "the initiation of a criminal Complaint against him based on false statements and/or the issuance of a warrant and/or some criminal adjudication."  Id. at ¶ 53.  In Count IV of the Amended Complaint, plaintiff alleges that his right to due process under the Fourteenth Amendment was violated by "Defendants School District and Director Holmes' encouragement, toleration, ratification, and/or deliberate indifference to prior violations committed by School District Police Officers and their subsequent failure to sanction, discipline, and otherwise address violations of their policies is a direct and proximate cause of Officer Smith's initiation of criminal process against Plaintiff based upon false statements."  Id. at ¶¶ 58, 60.

In response to the summary judgment motions of defendant SDP and defendant Holmes on Count IV, plaintiff avers that the evidence shows that SPO Smith submitted a false police report stating that plaintiff struck him twice in the head.  See Doc. 44, Exs. H and I. Plaintiff contends that the video of the incident reflects that plaintiff did not strike SPO Smith in the head and SPO Smith has since acknowledged that plaintiff did not strike him in the head. See Smith Dep. at 63:19-64:1, 85:9-12.  Plaintiff states that SPO Smith's false report led to a Philadelphia Police investigation of an assault of a teacher in a public school.  See Smith Dep. at 65:2-19; Doc. 44, Ex. J.  Plaintiff posits that the initiation of this criminal process against him

has deprived him of the freedom of life, liberty and property guaranteed by the Constitution because he does not know if the police will arrest him one day and he is not able to move freely for fear of arrest. See Pl. Dep. at 96:7-24.

In Halsey v. Pfeiffer, 750 F.3d 273, 294 (3d Cir. 2014), the Third Circuit recognized a stand-alone procedural due process claim for fabrication of evidence, holding that if a defendant has been convicted at a trial at which the prosecution has used fabricated evidence, the defendant has a stand-alone claim under § 1983 based on the Fourteenth Amendment if there is a reasonable likelihood that, without the use of that evidence, the defendant would not have been convicted. The Halsey court cautioned, "testimony that is incorrect or simply disputed should not be treated as fabricated merely because it turns out to have been wrong. Therefore, for example, a witness's misidentification should not be regarded as a fabrication in the absence of persuasive evidence supporting a conclusion that the proponents of the evidence were aware that the identification was incorrect, and thus, in effect, offered the evidence in bad faith. Accordingly, we expect that it will be an unusual case in which a police officer cannot obtain a summary judgment in a civil action charging him with having fabricated evidence used in an earlier criminal case." Id. at 295.

Subsequently, the Third Circuit determined that an acquitted criminal defendant may have a stand-alone fabricated evidence claim against state actors under the Fourteenth Amendment's due process clause if "there is a reasonable likelihood that, absent that fabricated evidence, the defendant would not have been criminally charged." Black v. Montgomery Cty., 835 F.3d 358, 371 (3d Cir. 2016), cert. denied sub nom. Pomponio v. Black, 137 S. Ct. 2093 (2017). To meet the "reasonable likelihood" standard, the plaintiff must draw a "meaningful

connection" between his due process injury and the use of fabricated evidence against him.  Id. at 372 (citing Halsey, 750 F.3d at 294 n.19).

As set forth in Count IV of the Amended Complaint, plaintiff has presented this claim as a Monell claim against defendant SDP and a supervisory liability claim against defendant Holmes.  Plaintiff's fabrication of evidence claim fails for the same reasons as those set forth above with respect to the claims presented in Count II.  That is, with respect to the Monell claim against defendant SDP, plaintiff simply has failed to present sufficient evidence of a School District policy or custom of encouraging, tolerating, or ratifying prior instances of fabrication of evidence by SPOs.  Additionally, plaintiff has not offered any evidence that demonstrates that defendant Holmes participated in the alleged fabrication of evidence, directed others to fabricate evidence, or had knowledge and acquiesced in his subordinate's fabrication of evidence.

Furthermore, even assuming that plaintiff has demonstrated the other elements of a Monell claim or a supervisory liability claim based on his Count IV allegations, plaintiff has adduced no evidence that with deliberate indifference to the consequences, defendants established and maintained a policy, practice or custom which directly caused SPO Smith to fabricate evidence.  Indeed, as defendant SDP points out, SPO Smith's training records demonstrate that SPO Smith took a four hour class on report writing.  See Doc. 44, Ex. C.  This class is described as: "This block of instructions is to teach students the mechanics of writing an in-depth report and to stress upon them how vitally important it is for it to be accurate."  Id. Thus, plaintiff's Count IV claims against defendant SDP and defendant Holmes cannot survive summary judgment.  See Boseman v. Upper Providence Twp., 680 F. App'x 65, 70 (3d Cir.

2017) (not precedential) (affirming dismissal of Monell claim because plaintiff's conclusory allegations "do not meet the standards we have set for a fabrication-of-evidence claim").

### C. Count V – Failure to Train, Screen, and Supervise

In Count V of the Amended Complaint, plaintiff contends that his injuries and damages were caused by the actions of SPO Smith which resulted from defendant SDP's and defendant Holmes' "encouragement, toleration, ratification, and/or deliberate indifference to the patterns, practices and customs and/or to the need for the implementation of some, more or different training, supervision, investigation and/or discipline" in the use of force. (Am. Compl. at ¶¶ 64, 65.) Plaintiff further avers that defendant SDP and defendant Holmes failed to adequately screen SPO Smith prior to commissioning him as an SPO. Id. at ¶ 67. In addition, plaintiff contends that defendant SDP and defendant Holmes "failed to properly sanction or discipline officers who are aware of and subsequently conceal and/or aid and abet violations of constitutional rights of citizens" by other SPOs, which failures caused and encouraged SPOs, including SPO Smith, to violate the rights of citizens such as plaintiff. Id. at ¶ 68. The court construes Count V of the Amended Complaint as asserting a failure to train claim, a failure to screen claim, and a failure to supervise claim.

#### 1. Failure to Train

As noted supra, "failure to" claims, failure to train, failure to discipline, or, failure to supervise are generally considered a subcategory of policy or practice liability. Barkes, 766 F.3d at 316. The Supreme Court has cautioned, however, that "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." Connick, 563 U.S. at 61 (citing Oklahoma City v. Tuttle, 471 U.S. 808, 822-23 (1985) (plurality opinion)

(stating a "'policy' of 'inadequate training'" is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in Monell.")).

The Third Circuit explained the "failure to train" theory of liability as follows:

> A plaintiff seeking to hold a municipality liable under section 1983 must demonstrate that the violation of rights was caused by the municipality's policy or custom. [Monell, 436 U.S. at 690-91.] Liability is imposed "when the policy or custom itself violates the Constitution or when the policy or custom, while not unconstitutional itself, is the 'moving force' behind the constitutional tort of one of its employees." Colburn v. Upper Darby Twp., 946 F.2d 1017, 1027 (3d Cir. 1991) (quoting Polk Cnty. v. Dodson, 454 U.S. 312, 326, 102 S. Ct. 445, 70 L.Ed.2d 509 (1981)).
>
> Where the policy "concerns a failure to train or supervise municipal employees, liability under section 1983 requires a showing that the failure amounts to 'deliberate indifference' to the rights of persons with whom those employees will come into contact." Carter v. City of Phila., 181 F.3d 339, 357 (3d Cir. 1999) (quoting City of Canton, Ohio v. Harris, 489 U.S. 378, 388, 109 S. Ct. 1197, 103 L.Ed.2d 412 (1989) ("Canton")). Additionally, "the identified deficiency in a city's training program must be closely related to the ultimate injury;" or in other words, "the deficiency in training [must have] actually caused" the constitutional violation. Canton, 489 U.S. at 391, 109 S. Ct. 1197.

Thomas, 749 F.3d at 223-24.

Courts have repeatedly stressed that "deliberate indifference" is a "stringent standard of fault." The Thomas court stated:

> "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." [Bryan County, 520 U.S. at 410]. Ordinarily, "[a] pattern of similar constitutional violations by untrained employees" is necessary "to demonstrate deliberate indifference for purposes of failure to train." Connick v. Thompson, _ U.S. _, _, 131 S. Ct. 1350, 1360, 179 L.Ed.2d 417 (2011). "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." Id. A pattern of violations puts municipal decisionmakers on notice that a new program is necessary, and "[t]heir continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action - the 'deliberate indifference' - necessary to trigger municipal liability." [Bryan County, 520 U.S. at 407].

Id. at 223-24. The Third Circuit recently noted that while Monell requires a plaintiff to allege that a local government's policy or custom inflicted the injury, "[t]he pleading requirements are different for failure to train claims because a plaintiff need not allege an unconstitutional policy." Estate of Roman v. City of Newark, 914 F.3d 789, 798 (3d Cir. 2019). Instead, a plaintiff "must demonstrate that a city's failure to train its employees 'reflects a deliberate or conscious choice.'" Id.[7]

In addition to deliberate indifference, plaintiff must demonstrate causation. "[T]he identified deficiency in a city's training program must be closely related to the ultimate injury," meaning that the plaintiff must "prove that the deficiency in training actually caused [the constitutional violation at issue]." Canton, 489 U.S. at 391. In Canton, the Court noted that "the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform. That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program." 489 U.S. at 390-91. In addition, "a claim for failure to train turns on the deficiency of the 'program' as a whole and its application 'over time to multiple

---

[7]      A plaintiff may also advance a single-incident theory of liability. As explained by the Thomas court:

> The Supreme Court posited in Canton that in certain situations, the need for training "can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights" even without a pattern of constitutional violations. The Court offered a hypothetical example of this "single-incident" failure-to-train liability. Because "city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons," if the city arms the officers with firearms, "the need to train officers in the constitutional limitations on the use of deadly force" is "so obvious" that a failure to provide such training could provide a basis for single-incident municipal liability. Liability in single-incident cases depends on "[t]he likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights."

Thomas, 749 F.3d at 223-24 (internal citations omitted). However, in the case at bar, plaintiff alleges liability based on a custom of tolerating of past constitutional violations.

employees.'"  Lawson v. City of Phila., 2018 WL 925012, at *3 (E.D. Pa. Feb. 16, 2018)

(quoting Bryan County, 520 U.S. at 407).  The Canton Court also explained:

> It may be, for example, that an otherwise sound program has occasionally been
> negligently administered.  Neither will it suffice to prove that an injury or
> accident could have been avoided if an officer had had better or more training,
> sufficient to equip him to avoid the particular injury-causing conduct.  Such a
> claim could be made about almost any encounter resulting in injury, yet not
> condemn the adequacy of the program to enable officers to respond properly to
> the usual and recurring situations with which they must deal.  And plainly,
> adequately trained officers occasionally make mistakes; the fact that they do says
> little about the training program or the legal basis for holding the city liable.

489 U.S. at 390-91.  That is, a district court should impose liability only when "the training

should have been more thorough or comprehensive," not "merely because municipal training

could have been more thorough or comprehensive."  Berrios v. City of Phila., 96 F. Supp. 3d

523, 536 (E.D. Pa. 2015) (internal citations omitted) (emphasis in original).  In other words,

> [l]iability cannot rest only on a showing that the employees "could have been
> better trained or that additional training was available that would have reduced the
> overall risk of constitutional injury."  Colburn, 946 F.2d at 1029-30.  Rather, the
> causation inquiry focuses on whether "the injury [could] have been avoided had
> the employee been trained under a program that was not deficient in the identified
> respect."  Canton, 489 U.S. at 391, 109 S. Ct. 1197.

Thomas, 749 F.3d at 226.

The court construes plaintiff's assertions in Count V as alleging a pattern of

excessive force violations by SPOs, defendant SDP failed to provide adequate training and re-

training in the use of force, such failure amounted to deliberate indifference to plaintiff's Fourth

Amendment rights, and such failure directly caused plaintiff's injuries.  Plaintiff essentially

argues that SPO Smith's training was inadequate because he received training on the use of force

on only two occasions before the April 16, 2015 incident – during his initial training with the

School District in 2004 and in 2013.  See Pl.'s Resp. at 6 (citing Doc. 44, Ex. C (hereinafter

"Smith Training Records").  Plaintiff further avers that, despite missing training sessions on de-

escalation, SPO Smith was not disciplined nor forced to re-take the missed session. See id.[8]

Plaintiff also contends that other deficiencies exist in the SDP's training program in that SPOs who are found to have used excessive force are not re-trained and those responsible for training were not given performance reviews to determine if trainings were being properly conducted. See id. Here, plaintiff avers that before April 16, 2015, SPO Smith was not trained in the use of controlled holds, was not trained in gaining control of his environment, was not trained in crowd control, and "did not receive the proper training to handle the situation he was involved in on April 16, 2015." See Pl.'s Add'l Stmt. of Facts at ¶¶ 20-22, 26.

However, plaintiff has not demonstrated that defendant SDP and defendant Holmes[9] communicated a message of approval to SPO Smith in the use of excessive force.[10] Even assuming arguendo that he has, plaintiff has not demonstrated deliberate indifference on

---

[8]     The court notes that while SPO Smith's training record indicates that he was absent from a de-escalation training session on May 17, 2011, he was present during a de-escalation training session on November 8, 2011. See Smith Training Records at 660.

[9]     Defendant Holmes testified that he did not directly train officers because "there was a person who oversaw training and procured personnel to do the training and instruct the personnel." See Holmes Dep. at 28:13-21. Instead, defendant Holmes "ensure[d] that the training comported with our mission and subtle nuances of policing a school population versus policing the public at large." Id. at 28:29:3-7.

[10]     In Montgomery, the Third Circuit considered whether the plaintiff had demonstrated knowledge of a prior pattern of similar incidents and circumstances under which the supervisor's actions or inaction could be found to have communicated a message of approval to the offending subordinate." 159 F.3d at 126. The court noted that the plaintiff's failure to train, discipline or control claim seemed to be based on the contention that the defendant police officer was never trained not to sexually harass the female public and was not disciplined as a result of the incident involving the plaintiff. Id. The court found, however, that the plaintiff pointed to no inadequacy in the defendant officer's police training program. Id. In addition, the court also noted that the plaintiff failed to allege any action or inaction by the municipal defendants that could be interpreted as encouraging the police officer's offensive actions and finding that because the plaintiff's allegations did not implicate the type of deliberate indifference required for § 1983 municipal liability, the district court was correct in granting summary judgment in favor of the municipal defendants. Id.

the part of defendants.  That is, plaintiff has failed to establish that a municipal actor disregarded a known or obvious need for more or different training, and that the failure to implement such additional or different training would likely result in the violation of constitutional rights.  In contrast, the evidence shows that the School District maintains Directives on a number of topics, including, the use of handcuffs, the use of batons, legal authority, the use of pepper spray, School Police training, and the Use of Force Continuum.  See Doc. 44, Ex. M.  In addition, Harriet Farr, who retired in September 2014 from the position of training officer with the SDP, testified that SPOs received training on topics such as the Use of Force Directive, de-escalation training, conflict resolution, behavior management, and ethics.  (Farr Dep. at 13:6-13, 35:3-6, 40:4-22, 44:14-19, 76:2-10, 77:9-15.)[11]  The School District determined the continuing education requirements for SPOs and Ms. Farr developed the training program, extending the minimum number of training hours if necessary to properly address the determined curriculum.  Id. at 35:9-36:23.  The School District provided training at the beginning of each school year and also provided "in-service training throughout the year."  Id. at 41:12-21.  Ms. Farr also provided one-on-one training in issues such as de-escalation or conflict resolution if it was determined to be necessary, after a complaint was filed against an SPO.  Id. at 43:10-44:7.  In addition, new recruits received six weeks of training, which included use of force, de-escalation, conflict resolution, and professionalism.  Id. at 78:9-79:3.  Although he only recalled receiving use of force training as an initial recruit, SPO Smith's training records indicate that he received use of force training in 2004 and again in 2013.  See Smith Dep. at 39:5-13; Smith Training Records at 659, 666.  This evidence does not show a deliberate choice by defendants to follow a course of

---

[11]     The use of force training and de-escalation training included the use of role-playing.  See Farr Dep. at 76:11-77:3; 77:16-78:1.

action that would amount to a failure to train on how to avoid the use of excessive force. Plaintiff has not shown that defendants engaged in such conduct.

Moreover, even if plaintiff had identified a deficiency in the School District's training program, plaintiff must demonstrate that the deficiency was closely related to plaintiff's injury. See Lemar v. City of Phila., 2015 WL 4450976, at *6 (E.D. Pa. July 20, 2015) ("Plaintiff needs to show not only 'continuation' of the current deficient training, but also a convincing nexus between that training and the present harm."). Plaintiff has not established such a nexus. Rather, plaintiff's allegations that the training procedures were inadequate are merely conclusory. Plaintiff's argument amounts to nothing more than an assertion that the SPOs could have been better trained. See Cortese v. Sabatino, 2019 WL 1227842, at *4 (E.D. Pa. Mar. 15, 2019) (dismissing claims against police commissioner and city because plaintiff's claims were conclusory and unrelated to the injuries he allegedly sustained); Lopez v. City of Plainfield, 2017 WL 370781, at *14-15 (D.N.J. Jan. 25, 2017) (granting defense motion for summary judgment because plaintiff had not submitted any evidence as to why the training was inadequate); Hicks, 2017 WL 68620, at *4 (dismissing inadequate training claim as conclusory because the "mere allegation that Plaintiff was falsely arrested and subjected to excessive force, and that some other people have allegedly been treated similarly, is not enough to show that Defendants had an inadequate training program, and more critically, that such failure to train amounted to deliberate indifference"); Dotterer v. Pinto, 2016 WL 336870, at *7-9 (E.D. Pa. Jan. 27, 2016) (granting motions for summary judgment in favor of municipalities and police chief defendants because plaintiff failed to establish that there was a need for more or different training that was so obvious that the failure to implement such additional or different training would likely result in the violation of constitutional rights).

## 2. Failure to Screen

Plaintiff contends that defendants have displayed deliberate indifference to screening and hiring of SPOs, alleging that the School District "has hired and/or retained SPOs with prior criminal convictions, current criminal arrests and drug addictions and engaging in inappropriate behavior." See Pl.'s Resp. at 5. Plaintiff directs the court's attention to a newspaper article from October 16, 2011, in support of his argument that the School District had knowledge of the conviction of an SPO for theft and receiving stolen property prior to being hired by defendant SDP, and that the SPO was later arrested for criminal conspiracy, simple assault, and false imprisonment. Id.

"[A] municipality may indeed be liable for failing to properly screen its employees prior to hiring them." Does v. Se. Delco Sch. Dist., 272 F. Supp. 3d 656, 679 (E.D. Pa. 2017) (citing A.M. ex rel. J.M.K, 372 F.3d at 581). However, "[a] failure-to-screen claim typically requires the same two elements as a failure-to-train claim: deliberate indifference and causation." Id. (citing Bryan County, 520 U.S. at 409-11). In Bryan County, the Supreme Court considered the plaintiff's inadequate screening claim and stated:

> A plaintiff must demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision. Only where adequate scrutiny of an applicant's background would lead a reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire the applicant would be the deprivation of a third party's federally protected right can the official's failure to adequately scrutinize the applicant's background constitute "deliberate indifference."

520 U.S. at 411. Furthermore, the Court stated, "a finding of culpability simply cannot depend on the mere probability that any officer inadequately screened will inflict any constitutional injury. Rather, it must depend on a finding that this officer was highly likely to inflict the

particular injury suffered by the plaintiff. The connection between the background of the particular applicant and the specific constitutional violation alleged must be strong." Id. at 412.

Here, plaintiff has not pointed to anything in SPO Smith's background which would demonstrate that he was highly likely to use excessive force on plaintiff. Indeed, SPO Smith has no criminal record. He was arrested in 1998 at age eighteen for obstructing a highway passage. See Smith Dep. at 13:2-14:15. He pled guilty to a summary offense, took a class, paid his fine, and the incident was expunged from his record. SPO Smith has not been arrested since that date. Thus, there is no connection between SPO Smith's background and his alleged use of excessive force on April 16, 2015. Summary judgment will be granted on this claim. See Hicks, 2017 WL 68620, at *4 (dismissing claim for inadequate screening because nothing in the officer's background that should have led defendants to conclude that he would deprive a citizen of constitutional rights).

### 3. Failure to Supervise or Discipline

To establish a failure to supervise claim under § 1983, a plaintiff must:

(1) identify the specific supervisory practice or procedure that the supervisor failed to employ, and show that (2) the existing custom and practice without the identified, absent custom or procedure created an unreasonable risk of the ultimate injury, (3) the supervisor was aware that this unreasonable risk existed, (4) the supervisor was indifferent to the risk, and (5) the underling's violation resulted from the supervisor's failure to employ that supervisory practice or procedure.

Brown v. Muhlenberg Twp., 269 F.3d 205, 216 (3d Cir. 2001). In Sample v. Diecks, the Third Circuit emphasized that "it is not enough for a plaintiff to argue that the constitutionally cognizable injury would not have occurred if the superior had done more than he or she did." 885 F.2d 1099, 1118 (3d Cir. 1989). "Rather, the plaintiff must identify specific acts or omissions of the supervisor that evidence deliberate indifference and persuade the court that

there is a relationship between the identified deficiency and the ultimate injury." Brown, F.3d at 216 (internal citations and quotations omitted).[12]

   Plaintiff argues that the "investigation of the eleven SPOs . . . demonstrates Defendant SDP's failures in supervising and disciplining SPOs." (Pl.'s Resp. at 7.) Plaintiff asserts that the School District does not utilize a formal mechanism to investigate claims of excessive force against SPOs, and even if it did, "proper supervision and discipline would not be achieved because Defendant SDP allows SPOs facing disciplinary actions the opportunity to resign and keep their benefits." Id. Furthermore, plaintiff contends that the School District was on notice that its SPOs had engaged in criminal and reckless conduct and that defendant SDP has shown deliberate indifference to this notice. Id.

   Despite his allegations otherwise, the evidence does not support plaintiff's allegation that defendant SDP failed to supervise its SPOs. As discussed supra, defendant SDP investigates claims of the use of excessive force and other claims of impropriety against SPOs. See Lee Dep. at 42:24-45:3, 65:20-68:10. If it is determined that inappropriate conduct occurred during the course of an investigation, an SPO is recommended for discipline. The final determination of what discipline is appropriate is handled by an independent hearing officer after fact-finding hearing on the issue. See id. Of the eleven allegations of excessive force listed by

---

[12]  In Brown, the Third Circuit affirmed the district court's grant of summary judgment in favor of the defendant police chief. 269 F.3d at 217. The court rejected the plaintiffs' claim that the police chief failed to train Muhlenberg police officers on the proper use of force against animals because the policy manual in effect at the time of the shooting gave instructions on how to handle situations of this kind, and a reasonable trier of fact could not conclude that the failure to provide more formal training evidenced deliberate indifference. Id. In addition, the court rejected the plaintiffs' theory that the police chief must have been aware of the defendant police officer's alleged practice of using excessive force against animals and nevertheless failed to take appropriate disciplinary action because there was no evidence that the police chief had knowledge of any prior excessive use of force on animals by that specific officer. Id. Additionally, the court found that there was no evidence of a pattern of excessive use of such force by the particular police officer which would support a finding that the police chief should have been aware that the officer posed a threat in situations like the one in question. Id.

defendant SDP in its submissions to the court, two were determined to be unsubstantiated, five were determined to be unfounded, three resulted in a warning, and one resulted in the termination of employment. See SDP Mot., Ex. I. The evidence submitted by plaintiff reflects that defendant SDP conducted two additional investigations of excessive force which were not included in defendant SDP's list of investigations. See Doc. 44, Exs. V and W. Thus, the evidence does not establish deliberate indifference to the risk of the use of force by SPOs.

Furthermore, "a failure to . . . discipline or control can only form the basis for section 1983 municipal liability if the plaintiff can show both contemporaneous knowledge of the offending incident or knowledge of a prior pattern of similar incidents and circumstances under which the supervisor's actions or inaction could be found to have communicated a message of approval to the offending subordinate." Montgomery, 159 F.3d at 127 (citing Bonenberger v. Plymouth Twp., 132 F.3d 20, 25 (3d Cir. 1997)). Even if defendant SDP communicated a message of approval of the use of excessive force, SPO Smith did not get the message. As discussed supra, when asked whether he was aware, before April 16, 2015, of any other SPOs being disciplined for the use of excessive force, or for any other behaviors, SPO Smith indicated that he was not aware of any such discipline, indicating, "I wouldn't be in a position to know that." See Smith Dep. at 112:10-22. He also confirmed that he had not heard any rumors or talk to that effect. Id. at 112:23-25. In addition, SPO Smith acknowledged that he had never witnessed any SPOs using excessive force. Id. at 112:14-16. When asked whether he was aware of any SPO being fired for any type of disciplinary reasons, he replied, "[n]o, I wouldn't be knowledgeable about that" and "I'm not privy to that information." Id. at 113:1-5. This evidence demonstrates that SPO Smith was not aware of the purported lack of discipline, as

he testified that he "would not be in a position to know" if other SPOs were disciplined. Thus, the evidence simply does not support a failure to discipline claim.

Because plaintiff has failed to present evidence sufficient to establish claims based on a failure to train, screen, or supervise or discipline, the court will grant defendants' motions for summary judgment on Count V of plaintiff's Amended Complaint.

**IV.     CONCLUSION**

For all the above reasons, it is hereby **ORDERED** that the motion for summary judgment filed by defendant SDP (Doc. 34) and the motion for summary judgment filed by defendant Holmes (Doc. 35) are **GRANTED**. A separate Judgement Order will be entered.

BY THE COURT:


_/s/ Thomas J. Rueter_____
THOMAS J. RUETER
United States Magistrate Judge